Good morning. David Lunsgaard, appointed pro bono counsel on behalf of plaintiff appellant Damian Douglas. I'd like to reserve two minutes for rebuttal, if I may, Your Honor. Yes. You try to keep track and we'll try to help you. Thank you, Your Honor. This appeal poses two principal issues. First, should the mailbox rule of Houston v. Lack be applied to the filing date of Mr. Douglas' 1983 complaints? And second, if so, should Mr. Douglas be able to take advantage of a continuing violation exception to save the remainder of his claims as well, those that would be beyond the two years, even if the mailbox rule is applied. The mailbox rule is significant in this context because Mr. Douglas, it's undisputed, that Mr. Douglas placed his complaints in the mail on November 30th of 2004. Does it make a difference if we decide to apply the mailbox rule that he put it directly into the mailbox instead of into the hand of a jailer? No, Your Honor. That is one of the distinctions that the district court relied on, is that he used a mailbox as opposed to physically handing it to someone. But the courts have recognized since Houston, and in Houston it was a physical handing, the courts since then have recognized that using a prison mailbox still entitles you to the advantages of the mailbox rule. There's a certain irony in the language there. Could you just explain, so I understand factually how it works. I just did a tour of the correctional facility, federal facility down in Los Angeles, and they showed us the mail room. And so I have a visual image of that facility. Could you explain when you say he put it in the mailbox, can you describe physically what the setup was in his case? Because it went registered mail, didn't it? It did go registered mail, Your Honor. Just could you describe physically? I can understand that. Sure. The record is not detailed, for example, with respect to the layout of the prison. But the physical process here was that, according to the record, as I understand it, Mr. Douglas had his complaints in hand. He went to a central area. He paid for registered, he withdrew money from his account. He paid for the complaint in a secure prison legal mailbox. And at that institution, he's required to use the legal mailbox rather than the regular mailbox. Got it. Because then they don't open it and read it. That's right. That's right. It is separate. So from there, then it's just picked up by a postal employee and taken outside the prison? Or is it taken out by prison officials? My understanding is that it would then be taken out by postal service. But I can't tell you who is taking it out of the prison legal mailbox. Okay. Thank you. But I think, to get back to the question about whether it's significant, I think that the decisions the courts have specifically recognized on repeated occasions that the use of a mailbox, as opposed to physically handing it to prison officials, is not a dispositive distinction. And here we have record evidence that tells us when it was put in. So we're not dependent solely on his word as to when it was put in the box? Absolutely, Your Honor. It is specifically logged as November 30, 2004. And I think that that issue is also not in dispute. Does it make a difference that we don't have one of these short time periods like 30-day appeal or whatever it is, or even a one-year habeas limitation under AEDPA, but instead we have a longer statute of limitations? No, Your Honor. That is the principal distinction that the district court drew in electing not to apply Houston. However, the case law is uniform that that is not a supportable distinction. The two courts of appeals that have specifically addressed that, and I believe that was the Lewis and Sulek decisions, specifically rejected a distinction based on how long the time period was. And I would suggest that this Court's decision in the Fale v. Upjohn case, not the result in that case, but the reasoning being that since the preeminent concern is the pro se prison inmates' inability to control their filing and monitor the filing, would suggest that a distinction based on how long the deadline would be is insupportable as well. In fact, in Fale, the Court said specifically that there is no reason under Houston, given that preeminent concern, to treat civil filing deadlines differently. I want to make sure that you address the second point. Assuming that we don't have a problem with your argument on the mailbox rule, I want you to address the point of how maybe you have to amend, but can you amend, in order to allege a pattern and practice that would be sufficient that it would meet the standard that was set in the Morgan case. Because if, in fact, these incidences are discrete, actionable incidences, then under Morgan, I think that we can't, you know, that we do have statute of limitations problems. So do you want to address that? Yes. Obviously, the animus is the same. I mean, you could say, look, they went after him because of his religion or some other thing. And the animus never changed. It was discriminatory on that basis, an impermissible basis. Okay. But if in one case they took down his pants, in another case they took away his religious materials, third case they did something else, each one of which appears to me to be a discrete, actionable act. And so you don't get under the you don't get you fall within the continuous practice. So if you could address that. Yes, Your Honor. First, specifically to respond to one of the premises of Your Honor's question, while it's true in Morgan the Supreme Court rejected the related acts, I don't believe it went so far as to say that if you had discrete, actionable acts, that precluded you from a continuing violation exception. In fact, the subsequent descriptions of the continuing existence of the continuing violation act, for example, and this is from one of the cases cited by the county officials, a systematic policy or practice of discrimination that operated in part within the limitations period. So if you had a number of discrete acts that also constituted a systematic policy or practice of discrimination that operated within the limitations period, I believe you would still be able to access the continuing violation. So you read Morgan very narrowly. You say that we are in reading Morgan, but that's a different case. That has to be read very narrowly. It's not discrete acts. It's whether you have a continuing, I don't like Muslims, or I don't like Jews, or I don't like this, or I don't like that. And so that's the animus. It covers all of these acts. And it's your view that even if the animus remains the same, that I can go back and pull the earlier acts in. And I'm not talking from an evidentiary point of view, obviously you can't from an evidentiary point of view. I'm talking from the point of view of the statute of limitations. You say that we can read Morgan that way. Yes, Your Honor. That would be our suggestion as to how Morgan could be read. And I think that that's reflected in the subsequent case law. So that even if you had, I think what Morgan did is it said you cannot relate those actions simply by saying that they were related acts. You actually have to connect them by demonstrating that they constitute a systematic policy or practice. So there's nothing really in amending. You can't really amend around it. You're saying that essentially we'd have to take a look and see whether or not it's part of a continuing policy. If it is, you can come in. Yes, Your Honor. Even though exercised by different people. I mean, you had Officer A doing this, Officer B doing this, Officer C doing that. It's not even the same thing. We can just bring them, we can go back if it's the same policy. If it is, if they are sufficiently connected, Your Honor, yes. And this is And is a sufficient connection, the connection of the animus, is that the connection? Is it that I don't like X and my fellow guard doesn't like X, and therefore that's sufficient? We just don't like X? No, Your Honor. It simply wouldn't be sufficient to say that there is a similar animus. That would be, I think, just simply demonstrating related acts. It would have to be sufficient acts that were connected in time that would rise to essentially a policy or practice of the institution itself. You're saying it's a pattern and practice case. It would be similar to a pattern or practice case. Now, I think the pattern or practice and policy or custom are, you know, terms of art within the essential elements of the substantive violations of certain claims. And we're not talking about the substantive violations, though the courts often analogize to those circumstances in terms of explaining what the continuing violation exception to the statute of limitations would be. But I see my time is almost up, but I do want to emphasize that Mr. Douglas has not had the opportunity to amend. I think that his complaint obviously doesn't use a lot of the specific legal terminology, pattern or practice, et cetera. But I think if he was given the opportunity to amend, he could explain in more detail what the connections were between the particular incidents that he alleges and why he believes they are more than simply separate and discrete incidents, but are actually part of a pattern or practice policy or custom. Now, the district judge reached the mailbox rule question, but did not reach the application of the statute of limitations assuming the mailbox rule applies. So the district judge has done that, correct? She did briefly address it in one of the subsequent orders, Your Honor, to sort of simply say, and even if I were to reach it, I would still point out that only one of his claims was saved. I see. So the district judge has done that. Right. Okay. They have reached it. However, she did not allow amendment, and perhaps one of the reasons she did not allow amendment is because under her view of the mailbox rule, none of his claims were saved anyway. So there was no reason to allow amendment. There was no reason to do it. Okay. Let's hear from the other side, and we'll give you a chance to respond. Thank you. Good morning. May it please the Court. Jacqueline Weber, appearing on behalf of defendant's sentence, pronounced Noli, actually. Noli. Okay. Like N-O-L-L-E, like the plea, Noli? Exactly. Okay. Only it's spelled Noli. Okay. Anyway, having worked with him for many years, it took me a while to pronounce it correctly, so. The mailbox rule. This Court has looked at the mailbox rule in a number of different circumstances. As counsel has already pointed out, it has not, this Court has not discussed or applied the mailbox rule for the purpose of commencement of an action under Section 1983, which is what we're dealing with here. So this is an issue that this Court simply has not addressed previously. Several of the district courts, or at least two different judges in the District Court of Oregon have addressed the issue, and they've come down to two different conclusions. Judge Aiken in this case, and Judge Panner in the Ramirez case, two years apart. I think what this Court needs to do is to decide whether or not. I think we know it's a case of first impression, so you don't want to use your time up on that. Yeah. But the other district, or excuse me, the other circuit courts that have looked at this issue have simply said we're going to apply Houston as a bright line rule. Isn't this mailbox operated by the prison? The mailbox is in the prison. It is operated, well, it is operated by the prison to the extent that U.S. Postal Service has to be granted access to it. No, but I mean, they, or access in and out, in and out. I mean, it's basically a mailbox in prison. Correct. I mean, it's not like the inmate gives a call to the Postmaster General and say, my complaint's ready. Please pick it up. I mean, that doesn't happen, right? So I mean, the prison does it. I mean, the prison gives access, the prison runs it, don't they? The prison does run it, yes, and the prison does get access. But unlike in Houston, it is not a situation where a prisoner has to take their mail, their legal mail, and say, here, Mr. Prison Official, please put this in the mail for me. That's not the situation. The Snake River Correctional Facility has developed a system. So it should be at the peril of the inmate, is what you're suggesting. How it works is really the peril of the inmate. If the inmate gives it to the guard and says, take it, then that's the guard's problem. If the inmate puts it in the box, then that's the inmate's problem, even though he doesn't control the box. To the same extent, I believe so. I am saying that to the same extent that it is at the peril of any litigant who is not in prison who trusts it to be listed. But there's an intervening step, I think Judge Breyer is pointing out. In a public mailbox, your reliance is on the postal authority to carry out its duties. As you said, in the prison, the prison controls everybody's access, including the post office, to the mailbox. So if the prison, for whatever reason, was in lockdown, let us say, and they weren't allowing in outsiders, the mailbox for a day or two, could it not? Yes, it could. Okay, so in our Miller opinion, we expressed a concern about chicanery, about when it's given to the officials, they have to log it and they have to make a record of it. So we know that he actually, the prisoner, put it into their custody. In this case, the way it works is that, as I understand it, they logged it in before he could then put it in the mailbox. So we have a prison record of when he put it into the mail. Do we not? Something that would not exist for a normal citizen who would just go off and drop it on a corner mailbox. That is true. We have something more than we would have. And in addition, in this case... So we do know that there's no dispute that he put it into the regular prison mailbox on November 30th. The legal prison mailbox, yes. Yes, because that's logged in. That's logged. And he sent it registered mail. Okay. So we have that evidence. That registration goes to the fact of delivery, right? That's where you send registered mail for us, to make sure that the recipient got it. You know when the recipient got it. Correct, but in this case, he used that process and it is evidence of when he actually, that it was actually posted. So the concern about his line about when he put it in the prison mailbox is gone. Well, there's just no dispute, certainly. There's no factual dispute at all. I'll ask a different question. How do you respond to your colleague's point that, whether you can amend around it? Let's say we deal with the mailbox rule. But the question is, there were these eight acts or six acts or whatever that number is. Counsel suggests, well look, you know, he ought to at least be given leave to amend because he wants to show that it's an overall pattern in practice. And he's entitled to do it within Morgan. What's your response? My response is I don't believe that it can be cured by amendment because, in fact, the complaint as exists is quite detailed already. And what is alleged are discrete acts by different officers over a period of about two to three years. And the only commonality that he brings to those is the fact that in each case he filed a grievance under the prison grievance system, or excuse me, the jail grievance system, and was not satisfied with the result of his grievance process. But he alleges that, in consequence of filing the grievances, he is then treated badly, correct? That's the only... He alleges that, in consequence of his having filed the grievances, he is thereafter treated badly. Isn't that right? Isn't that what he alleges? He does allege that, but he alleges that as to specific officers and specific events. But why should we assume, without any factual evidence in front of us, that these are entirely independent events? It seems to me at least plausible that within the jail there's a system of getting after guys who filed grievances. I mean, that could be. I don't know. In other words, why can't he amend? Basically, that's my question, Judge Fletcher's as well. Why can't he amend around it, assuming the facts are there? That this is part of a practice of what we're doing in this prison, is anybody has a grievance, we're gonna retaliate. And it's right across the board. And by the way, there's six... We have four or five officers who have done this, or three or four, whatever that number is, and that's a good start. We're gonna show that it's widespread. It is the practice to retaliate. I don't know that the facts are there, but he's saying, look, he wants at least the opportunity to amend if, in fact, the facts are there. He doesn't want to be cut off at this point. Certainly, given notice pleading in federal court, he could amend and he whether he has factual support for them is very questionable. I can't stand here and tell the court that you have no right to, or no ability at this point, to send it back to the district court to allow for amendment for that purpose, if you think that the mailbox rule is going to apply in this case. But it's your position that the complaint, as it stands, isn't sufficient even under the liberal standards of Rule 8A? That is my position, yes, it is not. This court has, in the past, particularly in Caldwell v. Amend, suggested that a case-by-case analysis regarding the Houston Rule is what should be implemented, as opposed to the Brightline Rule that the plaintiff is asking for in this case. And I would urge that, in fact, that is an appropriate stance to take by the court because Houston was decided 20 years ago. Prisons have changed. The access of prisoners to the mail, the issue of being able to have a legal mailbox available to them, not having to trust it to prison officials. And also, simply their access to the courts is not as limited as it once was. And from a policy standpoint, if the court were to establish a Brightline Rule in this case, that any pro se prisoner who files can file the day before, put it in the mail, get the rule that says it must be filed, not mailed, on the particular day. It wouldn't cause too much of a problem, would it? I'm sorry? It wouldn't really cause too much of a problem, would it? I mean, still the prisoner has to prove that he or she filed it on a particular day. The burden is on the petitioner in that regard. And if they filed it, would it be such a burden? I'm trying to figure out why. Well, it's no burden at all in this particular case because Mr. Douglas knew exactly what he was doing. He knew that he was putting it in the mailbox the day before the filing deadline and trusting... Now, I assume that the prisoners don't have access to FedEx. I mean, what lawyers do... Actually, I don't know the answer to that question. No, what lawyers do, and sometimes they suffer for it, but they'll put it in FedEx the day before. And they'll come to court at 11.58 at night and file it in the depository and then ask the judge the next morning, did you read this? I filed it yesterday. We sort of get 28-day lawyers like that. We're talking pro se prisoners here, and if you equate that to a pro se plaintiff who is not incarcerated, I think you're putting the pro se prisoner at an advantage that the non-pro se litigant does not have. Okay. We take the point. Good point. Thank you. Do you have a response? We'll give you a minute if you have one. Very, very brief. If you can address one question for me, which is, do you think that you can amend this complaint? Yes, absolutely, Your Honor. And one of the things that I would like to address specifically there as to my reading of Morgan, I direct the Court's attention to footnote three of this Court's Carpentaria Valley decision, in which the recognized that prior Ninth Circuit precedent allowed plaintiffs two methods by which to avail themselves of the continuing violation doctrine. Although the Court, the Supreme Court, invalidated the related acts method, it declined to address the systematic pattern or practice method. And that's why I suggest that Morgan doesn't preclude us from using systematic pattern or practice. But you understand, pattern and practice claims generally are statistical, are supported by statistical evidence, aren't they? I mean, you can't allege a pattern and practice by saying, well, three people did it, or four people did it. You have to establish a statistical base. You have to have a statistical base that then establishes a pattern and practice, absent some memo from the or policy from the, written policy from the superiors saying we do it this way. Yes and no, Your Honor. Yes, and this was the distinction I was trying to draw earlier between elements of a substantive pattern or practice claim and pattern or practice used as a variant of the continuing violation doctrine to deal with the statute of limitations issues. Those two are sometimes analogized, but they are not exactly the same thing. And there are cases, and we've cited some in the past, and this was a New York District Court opinion where there was evidence of two government officials who were lying in their testimony, and the court accepted that as sufficient evidence, at least on an initial basis, of a pattern or practice continuing violation, not for purposes of establishing a Title VII case, but for purposes of a continuing violation exception to the statute of limitations. So that's the distinction I'm trying to draw there. And I have a question that may be related. I know that you're pro bono counsel for purposes of appeal. If we were to hold that the mailbox rule applies and then at least some part of the complaint survives, will you be representing him after we remand to the District Court? There is no present plan to do that, Your Honor, and I have not discussed it with my client. The order appointing me was for appeal purposes only. Yeah. My firm would have to think about whether or not to continue to provide those pro bono services. I thought that was the answer. Okay. And finally, Your Honor, there's one thing I feel obligated to mention, and that's to draw the Court's attention to its recent decision in Lukovsky. This is adverse to my side, so that's why I'm bringing it up. This is Lukovsky v. City and County of San Francisco. The citation is 535 F. 3rd. 1044. It came down as the briefing was being completed here. I became aware of it Monday night. It addresses, I think, not dispositively, but somewhat negatively, some of the discovery rule arguments that were made in our briefing, and I felt obligated as an officer of the Court to bring it to the Court's attention. We appreciate that high quality of professionalism. We do. We do have a process for 28 J letters, by the way, so you can let us know in advance by... You know, Your Honor, ordinarily, I would have, but since it came to my attention Monday night, I felt that there wasn't... You could have taken advantage of the late filing. Just put it in our box. Your Honor's description of that process was something I wasn't aware of, but perhaps in the future I'll take advantage of it. Okay. Thank you both for quite helpful arguments on both sides. Thank you. Douglas v. Nolley is now... Noelling. Nolley, and I plead NOLO, is now submitted for decision. That'll teach you all to come early. This is a crazy thing. Okay. Next argument is United States v. Hudson, please. When you're ready, Counsel.
judges: Fletcher, Fisher, Fletcher